# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Sabine Wright, | : | CIVIL ACTION LAW |
|     Plaintiff | : | NO. _____-cv-_____ |
| | : | (Judge _____) |
| v. | : | |
| | : | (Magistrate Judge _____) |
| Lorain City School District | : | |
| | : | JURY TRIAL DEMANDED |
|     Defendant | : | |

## COMPLAINT

Plaintiff, Sabine Wright, an Ohio citizen, by and through counsel, Andrew W. Barbin, P.C., brings this action against the Lorain City School District, and alleges upon knowledge, information, and belief, as follows:

## PARTIES

1. Plaintiff, Sabine Wright, is an adult female resident of Ohio residing at 1436 West Erie Avenue Lorain, Ohio 44052 (hereinafter "Wright" or "Plaintiff").

2. Defendant, the Lorain City School District (hereinafter "School District" or "Defendant"), with an address of 1439 W Erie Ave, Lorain, OH 44052 is a municipal school district whose employment actions are at issue in this matter.

## JURISDICTION AND VENUE

3. Jurisdiction and venue are proper in this Court as all claims arise under

1

federal statutes regarding activities within the geographical jurisdiction of this District Court. 42 USC §§12101 et seq. and 29 USCS § 626 et seq.

4. All Parties and most if not all probable witnesses reside in the Northern District.

**Jury Demand**

5. A jury trial is requested on any and all issues upon which a jury trial is permitted.

**Facts Common to All Counts**

6. At the time of the relevant events Lorain City School District was a distressed district, and was in the midst of significant administrative turnover, facing a reorganization and Reduction in Force (RIF).

7. All agents of Defendant were aware of the risk of an impending RIF.

8. Mrs. Wright started with Lorain City Schools as Auxiliary Service Coordinator in 2000, was also the Textbook Clerk for the district handling 10 elementary schools, 3 middle schools and 1 high school. Approximately 75% of her salary was from General Fund covering her textbook duties. Auxiliary funds covered the remaining 25%.

9. Auxiliary funds are from the Ohio Department of Education and are for all students in the nonpublic school K-12. Funds are allocated per student and

are dispersed to the local school district as the agent of the funds for the nonpublic schools. Auxiliary funds are to provide services to the students in the nonpublic school that they would receive if they attended a public school. Services include speech therapists, psychologists, nurses and health aides.

10. Auxiliary clerks are also paid from these funds and they are responsible for walking the students to and from the location they receive their services, processing requisitions for orders, inventory and other clerical duties. Funds remaining can be used to purchase computers, textbooks, workbooks, software etc for student use only.

11. Auxiliary funds are a biennium fund in that unused funds from year 1 are rolled into year 2 and funds at the end of year 2 are returned to the Ohio Department of Education. Mrs. Wright was well aware of this requirement and never made any attempt to evade it. This was not, however, an unspent funds situation.

12. The situation here arose not because of a failure to spend funds, but a decision of a new principal to seek return of equipment ordered purchased and delivered on an order of the predecessor principal. Timing aspects are relevant to any objective assessment of the situation here.

13. Lorain City Schools did not hire an Auxiliary clerk for St. Anthony of Padua School in Lorain for the 2019/2020 school year. Mrs. Wright was asked

to take on those activities as well as her regular duties.

14. The 2019/2020 school year was year 2 for the Auxiliary funds.

15. Due to several factors the school had a usually large amount of funds to spend prior to the end of the fiscal year.

16. Mrs. Wright assisted the principal at the time, Lucia Heddleson, with placing orders.

17. Mrs. Wright encouraged Ms. Heddleson to have all orders submitted to her prior to the ordering deadline.

18. Neither Ms. Heddleson nor any other agent of Defendant informed Mrs. Wright that the Principal was leaving the School District.

19. Ms. Heddleson selected some magnetic glass easels for the students to use in each classroom and the order was processed.

20. The boards ordered were over $1,000.00 per unit, 24 were ordered, 2 for each classroom.

21. After the orders were processed and issued, the principal informed Mrs. Wright (toward the end of May) that she would be leaving.

22. The Boards arrived and were processed and stored at the school around June 28, 2019.

23. Had Mrs. Wright known that the principal intended to leave the district, additional guidance might have been sought *before* ordering; but she was

not in the loop on the issue until after the orders were issued.

24. During that time period, Mrs. Wright was supervising the inventory of curriculum materials and textbooks for 4 new programs for Lorain City Schools and the annual orders for consumable workbooks etc.

25. She was running back and forth between the elementary schools and to St. Anthony to take care of their orders. She was extremely busy with the expanded workload.

26. Mrs. Wright was also recovering from a double knee replacement with no offer of assistance or accommodation in light of her recovery or expanded workload during recovery.

27. The new principal, Julio Alarcon, was hired in June with a start date of July 1, 2019.

28. He had been recruited from the Charter School system and had limited awareness/familiarity with Auxiliary funds.

29. Mrs. Wright assisted in familiarizing him with the system.

30. The nonpublic schools also receive Title 1 funds and IDEA-B funds for students with an IEP.

31. Mrs. Wright's supervisor, Ms. Rachel Tansey, handled the federal funds and grants and oversaw the Auxiliary program.

32. Sometime in mid-July Mr. Alarcon indicated that, if possible, he

would like to return the boards and secure alternate equipment.

33. While Mrs. Wright was fully aware that unspent funds were required to be returned to the state, this particular involving potential return for credit in the second year had not previously arisen and was complicated by the significant dollar amount at issue.

34. If possible/permitted, it was certainly in the interest of the school that the new principal receives equipment desired, rather than equipment not desired.

35. Mrs. Wright communicated to new Principal Alacron that she did not know if it was possible but would check into it.

36. Her only motive was to see that the new principal received whatever could be provided to aid his educational mission.

37. Her first step was to check with the vendor, as there was no actual right to return the products which were ordered and delivered as ordered.

38. It took some time to get a response, but after follow-up, the vendor indicated it was willing to accept back the product and issue a credit less freight and restocking fees (which are standard and usual terms on a discretionary returns).

39. At the end of August, the vendor agreed to pick up the boards and issue a credit against which future requisitions would be ordered, if permitted.

40. Mrs. Sabine then requested Principal to create a list of items desired from the vendor.

6

41. A credit memo was issued by School Specialty September 28, 2019.

42. The vendor confirmed that while it was not yet aware of any credit Memo from School Specialty, it would still honor a direct credit.

43. It is important to note that there was nothing whatsoever clandestine in the communications and most of the communications (other than *in person* with Principals), were by school email accessible at all times by the administration.

44. Lorain City Schools Treasure Josh Hill was hired by a different school District in July 28, 2019.

45. At that time, it was also known that the CEO would be leaving as well.

46. This created an effective void in management at the School District.

47. In August and early September there was a public legal dispute as to whether and for how long either Treasurer Mr. Hill or then CEO Hardy would remain at Lorain, there was considerable upheaval and leadership was generally not available.

48. On September 25, 2019, Mrs. Wright was called to a meeting with outgoing Treasurer, Josh Hill, finance manager, Diana Miglets, and Chief of HR Jacqueline Younker.

49. They wanted to discuss the Credit Memo and asked what had transpired.

50. Mrs. Wright directly and forthrightly summarized the events as outlined above.

51. Mr. Hill indicated that it would not be legal to use the credit memo, as the funds had to be spent before the end of the fiscal year.

52. Mrs. Wright explained why she thought it might have been possible but accepted the directive not to utilize the credit memo, and indicated she would have the credit memo cancelled and have the vendor refund the funds for return to the state.

53. Mr. Hill did not explain why a request could not have been made for approval by the funding source, given the unusual circumstances.

54. No orders had been made on the credit memo, and so funding violations had occurred.

55. Mr. Hill made no attempt to determine whether a credit memo could or would be approved by the funding source.

56. There were no negative findings against the School District and the claim of risk assumed that an order would be placed before seeking and receiving guidance, which is wholly without basis in fact.

57. Mrs. Wright confirmed that she had not ordered anything on the credit memo, as she had already indicated she intended to seek guidance and approval.

58. Importantly, Mrs. Wright learned for the first time on September 25,

2019 that an email had been sent to Principal Alarcon on July 1, 2019 which allegedly informed him that a credit memo could not be used, and that the money would have to be refunded and returned to the state.

59. It was not alleged at the September 25, 2019 meeting that Mrs. Wright was copied on the email (which she should have been) or that Principal Alarcon even alleged he had shared the information with her.

60. No copy of the alleged email was provided nor any content of any claimed investigation.

61. October 1, 2019, Mrs. Wright was called to a meeting and summarily informed by her Supervisor Ms. Tansey and Associate HR Director Faith Palmucci that Mrs. Wright was being placed summarily on paid leave pending investigation.

62. Whatever investigation transpired between October 1, 2019 and l February 21, 2020, announcing termination effective February 28, lacked any semblance of Due Process.

63. Mrs. Wright was never afforded any notice of adverse claims, any chance to review documents or opportunity to respond to claims of others.

64. This incident occurred during a period of employment insecurity for several participants, as well as transitions between key players.

65. Mrs. Wright contends the termination was discriminatory on the basis of Race (others of another race treated differently and better), Age, (she was

63), Disability (she was scheduled for surgeries which would require medical leave at the time of the adverse actions and was recovering from surgeries at the time of the incidents).

66. While she was on paid leave, in order to minimize any impact on the district, she scheduled necessary foot surgery.

67. Mrs. Wright was recovering from foot surgery she had scheduled while on leave to minimize disruption in the event of her reinstatement, at the time unilateral discharge action was taken without notice or opportunity to defend.

68. It is believed and averred that knowledge that she was going to be on medical leave and her age (63) materially and unlawfully contributed in a "but for" manner to the discharge decision.

69. It is believed that the School District allowed materially interested parties to impact the decision in a manner which failed to meet due process requirements and that they knew or acted in reckless disregard of such material conflicts.

70. The reasons stated for termination were false, pretextual, defamatory and discriminatory on the basis of disability and age.

71. Mrs. Wright was also treated differently and worse than similarly situated employees who were terminated as part of the reorganization and reduction in force at that time on the basis of race, disability and age.

72. Pretext may be implied from the false assertion of a "conspiracy," where there is not the least motive or evidence of secrecy on the part of Mrs. Wright.

73. The suggestion that there was a conspiracy, was as insulting as it is defamatory.

74. Mrs. Wright has provided 20 years of good and faithful service and was discharged without notice or opportunity to be heard, any apparent consideration of actual mitigating circumstance, or her long prior faithful and competent service.

75. Pretext may also be implied from the existence of a gossamer alternate basis asserted in the discharge letter.

76. That will be clearer when the ages of those to whom duties were reassigned are considered.

77. There is a race issue in relation to the differences in the treatment of employees Prass and Younker, whose separations were handled differently and more favorably as to termination selection and severance issues.

78. It is believed and averred that the disclosure of the so-called "investigation file" will contain further evidence of pretext and that disclosure of the Employment files of those involved in the investigation and the reorganization files will provide further evidence of discrimination.

79. Mrs. Wright is amenable to early mediation.

80. Mrs. Wright seeks all statutory remedies including out of pocket lost wages and benefits to full retirement date, compensatory damages and attorney fees.

81. While prior conduct stands outside the limitations period, the underlying facts remain relevant to the context of the present actionable conduct, and to the issues of awareness, causality/animus and impact.

82. Counsel for Plaintiff emailed a Demand Letter and Notice of intent to file an administrative complaint in late September 2020.

83. Plaintiff, through counsel mailed an administrative Complaint to the EEOC in Cleveland in early October 2020.

84. The EEOC office did not acknowledge or act on the Complaint, but that was anticipated because of Covid related issues.

85. Counsel engaged in continued resolution related communications with counsel for the School District.

86. When no action or acknowledgment was forthcoming in November or December, undersigned reissued an EEOC Complaint December 29, 2020.

87. The EEOC issued a right to sue letter on January 14, 2021.

88. This Complaint is timely filed, and the school district was timely notified and invited to engage in the cooperative interactive voluntary process

which was intended by the statutes.

89. Covid created unique and unprecedented obstacles to the effectuation of the intended administrative process as did the transition to a rigid and non-interactive electronic processing approach by the EEOC.

### COUNT I – AGE DISCRIMINATION - FEDERAL

90. Paragraphs 1 through 88 are incorporated by reference herein as if restated verbatim.

91. Defendant is an employer subject to the federal prohibition on discrimination on the basis of age.

92. Defendant was engaged in a reorganization plan involving a planned reduction in force.

93. Plaintiff was a non-union contract employee.

94. Plaintiff was wrongfully discharged on the basis of her age.

95. Her duties were transferred to persons materially younger without disabilities or perceived disabilities.

96. Defendant allowed interested parties also involved in or subject to termination to make pretextual claims in a disciplinary/discharge process which involved deprivation of basic due process rights to affect a wrongful discharge of Plaintiff materially, motivated in a but for manner on the basis of age and recent and current physical disabilities and in retaliation for asserting pretext age and

disability claims.

97. Plaintiff seeks compensatory damages and attorney fees as provided by law.

**WHEREFORE**, Plaintiff seeks lost wages together with unliquidated compensatory damages for pecuniary and/or benefit loss, ordinary emotional distress, legal fees, and such other relief as this Court may deem just to make Plaintiff whole and/or prevent recurrence of the prohibited conduct.

### Count II – ADA Claim- Federal

98. Paragraphs 1 through 96 are incorporated by reference herein as if restated verbatim.

99. Defendant is an employer subject to the federal prohibition on discrimination on the basis of disability and/or perceived disability.

100. Defendant was engaged in a reorganization plan involving a planned reduction in force.

101. Plaintiff was a non-union contract employee.

102. Plaintiff was wrongfully discharged on the basis of her disability and/or perceived disability.

103. Her duties were transferred to persons materially younger and without disability.

104. Defendant allowed interested parties also involved in or subject to

termination to make pretextual claims in a disciplinary/discharge process which involved deprivation of basic due process rights to affect a wrongful discharge of Plaintiff materially, motivated in a but for manner on the basis of age and recent and current physical disabilities and in retaliation for asserting pretext age and disability claims.

105. Plaintiff seeks compensatory damages and attorney fees as provided by law.

106. Undersigned was admitted to practice in the Northern District of Ohio June 6, 1985.[1]

**WHEREFORE**, Plaintiff seeks lost wages together with unliquidated compensatory damages for pecuniary and/or benefit loss, ordinary distress, legal fees, and such other relief as this Court may deem just to make Plaintiff whole and/or prevent recurrence of the prohibited conduct.

**Respectfully submitted**,

/s/ Andrew W. Barbin
Andrew W. Barbin, Esquire
Andrew W. Barbin, P.C.
5 Kacey Court, Suite 203
Mechanicsburg, PA 17055
(717) 421-7383
Attorney for Plaintiff

DATED: April 12, 2021

---

[1] Undersigned was admitted separately in Ohio and Pennsylvania by examination May 13, 1985 and October 29, 1985. Undersigned has since gone to inactive status in Ohio state courts. Undersigned was admitted to practice in the Federal District Court for the Northern District of Ohio on June 6, 1985.